Good morning, Your Honors. M. Richardson Lynn appearing this morning for the plaintiff and appellant, Carmelo Galea. We are not trying to win the case on appeal this morning. We're trying to obtain the right to have a trial to see if we can win. Mr. Galea had a reasonable and plausible basis to rely on the Burgess assurances of the no personal recourse premium loan financing on this transaction because Burgess was a premium loan financing professional and because Galea had no prior experience at all on this type of transaction. I thought that he looked at it and thought that it looked like a personal guarantee. Well, the document said that on the top, Your Honor. So how is that? That's my problem with your reliance theory. I understand. That was the problem of the district court judge, but Mr. Galea . . . Well, actually, I think there were two. I'm not, just if it helps you with your argument, I'm not questioning the duty owed. I'm questioning reliance on. Right. Okay. All right. Well, the district court felt that when that guarantee appeared in the loan documents, which was inconsistent with the representations that had been relayed to Mr. Galea about no personal recourse financing, the district court felt that the beginning, the middle and the end of the entire discussion was that he signed the guarantee and that no other fact . . . But not only that, but there was an explanation to him as to why it was there, which he was given at that time, which he seemed to accept and which seemed to be pretty much exactly the situation that ensued. That is, it was there. He said he understood that the reason he had to sign this was because if it turned out that he didn't renew the policy and couldn't pay the loan, then he had to personal guarantee it. And that's exactly what happened. Well, it wasn't not renewing the policy. He thought in his mind that he wrote in his declaration and testified that if he should decide to just cancel the policy and . . . But that's not paying the second year. Well, he canceled it because he didn't pay for the second year. Correct. That's canceling. And of course, the financing should have been in place at the beginning for a second year because the policy, unless you had at least two years go by, which is the contestability period, the policy has no value, $25 million. That's all part of the scenario of this transaction. And why . . . But all I'm saying is that he understood, he specifically understood. And that's just that he read it. But he specifically understood. And not only said right on it that it was a guarantee, but he understood that it was a guarantee for a specific circumstance, which was this circumstance. So what's the problem? I don't think that was the circumstance, Your Honor. I'm not certain I agree with that. But it leads into a scenario of, you know, there was a negligence claim, which the district court gave short shrift to. It's possible that upon trial, a jury could find that Mr. Galea was responsible for some percentage of negligence. They could find that he was totally responsible upon trial. But there's all these other facts and these other people involved. And he had been assured that this was going to be no personal recourse. So, you know, Burgess never contacted him. He had a duty to contact him. But Burgess wasn't his . . . What was Burgess's relationship to him? Burgess was a . . . himself a licensed insurance agent, but he held himself . . . But this had nothing to do with that. Well, I'm just trying to explain who he was, Your Honor. He was this person who held himself out to be an expert in this premium loan financing on very, very large insurance policies. He was who was appointed by Lincoln, the actual insurer on these policies. Burgess was just this professional brought in to obtain the premium financing. But who was he brought in by? Castro, right? Hammett? No, Hammett. That's correct, Your Honor. Hammett was an attorney who Castro obtained, who asked him, do you know somebody that can do the premium financing on this kind of a transaction? And he said, yes, there's this guy, Burgess, located in Utah. So was Burgess Galea's agent in any sense for anything? I would say no, but that doesn't matter on . . . Well, why doesn't it matter then? Well, he doesn't have to have a privity of contract relationship for the duties to be owed by Burgess, and we cited a lot of law on that in our brief. Can I back up one second? Because whether Hammett directed originally to Burgess isn't the allegation that the communication went from Burgess to Castro to Imbaibo to Galea? Yes, well, the communication was Burgess to Castro and Hammett on these assurances. Hammett was involved . . . Well, but that doesn't get you back to the CPA, and then to your client, right? It went the other way. That's correct. Imbaibo was the CPA for my client. All right. And he communicated with Castro, who communicated with Burgess? Yes. All right. That's correct. So, and I'm also, I want to just but the declaration of our standard of care expert, in this case, really, really lays out this whole scenario of this . . . But what that declaration does for me is, that's why we started at the top of the hour, so to speak, with duty and breach. You still have to get around . . . you've got a causation problem, a reliance problem, it seems to me, that permeates all of the causes of action that I see here. So, I want to give you a chance to respond, but I come back to this personal in fact, asked for legal advice about what does this thing mean? I think it looks like a personal guarantee. And Burgess should have contacted him and explained all of that, but he did not. He had a duty to do so. That's part of our . . . Well, when your client said, hey, this looks like a personal guarantee, who did he raise that with? With the CPA? Yes. Not with Burgess? No, he never met or spoke . . . In fact, he didn't even know who Burgess was at that time. He didn't find out the actual person until later that was placing the financing. Okay, but your client asked the CPA, who was his original sort of advisor, this looks like a personal guarantee, and then he got a legal opinion on it, right? Not a legal opinion, no. I think the CPA testified . . . Wasn't it an associate of Hammett? He tried . . . no, he never . . . he didn't talk to Hammett. He tried to get a hold of an attorney . . . No, what I said is, my understanding from the briefing is that he spoke to an associate in Hammett's office. In Castro's office. Oh, in Castro's office. I think it was Mr. Guerrero or Guerriero. He was somebody that worked with Mr. Castro, and Guerrero said, well, it doesn't mean that. Well, maybe there's a claim there, I don't know, but I'm struggling with how it is that your client can show reasonable reliance on what he understood to be a representation vis-a-vis Burgess. Because he's not an experienced person, this is a very complex transaction, Your Honor, and he . . . Well, he was a pretty sophisticated individual himself. Well, he's the owner and operator of a successful precision tooling company, and he never had any . . . the only insurance he had in the past was a $500,000 life insurance that he paid cash for the premium on that. This is $25 million, $1.7 million just for the first year premium. So, can you tell me again what it is he thought this guarantee did do? He thought it was for what? He said that he thought that it meant . . . it must have meant, and nobody told him this specifically, but he testified that he thought it meant, well, this must mean that I . . . if I decide to cancel the policy, and then . . . I was informed at that time that the personal guarantee simply was a document that was being requested of me in case the loan was funded and the premium paid, but then later I decided to cancel the life insurance policy before the premium financing loan was ever repaid, which is essentially what happened. That's what Mr. Gailey said. Well, it didn't get canceled. Well, what do you mean by it didn't get canceled? He didn't pay for it, and therefore . . . No, he didn't cancel it. Well, he didn't pay for it. He backed out. He decided to not go forward, and it lapsed, right? Well . . . So, how does that . . . It went by a year. A year went by, and then the policy lapsed because the second year's premium wasn't paid. Right. And that's all part of the negligence of Mr. Burgess because he didn't arrange at the outset for the second year's premium to be taken care of. But essentially . . . but he was essentially saying was exactly the problem, which is that . . . I mean, I found it . . . I had never heard of any of this kind of transaction. It seemed amazing to me . . . Well, he couldn't have afforded to pay that kind of money for all those years. It was supposedly . . . Well, that's right. . . . at this time and these circumstances, I'm going to say . . . But when he realized that . . . What's that? What did he think he was getting the next 1.7? He thought that the policy, because of his age, was going to increase in value, and the policy was essentially paid for itself. I mean, unless he dies in that first year, the security's not worth anything. Right. It's not . . . The policy isn't worth anything, according to our experts. And the security's not worth anything to the bank. Two years have gone by. Two years have to go by before it's worth anything. It's still not worth anything to the bank. No, it starts to accumulate substantial value then, apparently. But, you know, that's the way these transactions were during . . . And maybe it was a crazy period where people were doing this for . . . Our expert explains all that in his declaration. But by the time 2008 rolled around . . . You know, by the way, you might be interested to know that Hammond and Castro were involved in another case, a completely different thing that we had on this calendar. I don't know if you know that yet. Completely different problem. Okay. There was a lot of intermediaries on this . . . What's your strongest argument? What's your very strongest argument? You think there's an issue of fact and you should have been able to get to trial. Yes. What's your strongest argument? Well, the strongest argument is that the issue of reliance is ordinarily a question of fact, as is causation, and that the law says that the . . . supposed to look at all the peculiar qualities and characteristics of the plaintiff and the circumstances of the case and whether or not the plaintiff was manifestly unreasonable in relying or not. Those are all inherently factual issues. And here we've got Mr. Galea. Yes, the document, he signed it. It said guaranteed, but he's been told that this is supposed to be no personal recourse. And so the jury has to say . . . I'm sorry, Your Honor. He was not told that by Burgess. Burgess didn't tell him that. No, it was related to him, but Burgess knew who . . . I mean, the real problem is all these intermediaries, and I gather they were sued as well elsewhere. Is that right? Yes, and we've settled with a couple of them. So we have this universe of people, including all these intermediaries, all of whom are making money on the deal, a lot of it in the case of Castro and . . . But Galea was making money on the deal. I mean, that's the other question. Galea got some money back on the deal. I don't think it's my place to characterize my opinion of this whole transaction, but Galea ends up being the victim here because he's holding the bag at the end of the day. Everybody else is making money. Burgess is making well into six figures for doing minimal work placing this loan, and he never talks to Mr. Galea. He only attempts to talk to him when it looks like everything is exploding and they've got to try to refinance and get the second-year premium lined up, and he comes out and meets with him. Should have done that at the front end. Should have . . . he has his own . . . I'm not going to repeat the entire record, but know your client internal policy, plus our expert is stating the standard of care was for Mr. Burgess to specifically talk to Mr. Galea, make sure he understood. There was even an email afterwards from Burgess' office that they admitted that there was confusion on the transaction and they wished that they'd talked to the client. So all of that scenario has to be heard in the context of a trial. It's our contention. And so that the jury can sort out the percentages of comparative negligence. I'm not saying, I'm not necessarily saying that it's only Burgess that has the negligence here. There's a bunch of people that may have negligence, but a trial has to sort that out and determine what the percentages of responsibility are. For Mr. Burgess to come in and say, I have no, zero responsibility, and the court to uphold that at the district court level . . . Why don't you save some time for rebuttal? We think that that's the error. Yes, a couple minutes left. I'll save it for rebuttal. Thank you. Good morning, Your Honors. Can you hear me? Yes, just speak loudly. All right. Speak into the mic. My name is Carolyn Chan. I'm with Lewis, Brisbois, Biscard, and Smith. I'm here on behalf of the defendants and appellees, Stephen Burgess and the Burgess Group. I think that the panel understands this case. I think that you realize that the plaintiff has a real problem with reliance, and reliance ties into causation, and therefore the summary judgment was properly granted as to both the fraud claim and as to the negligence claim. Why didn't Burgess have some obligation to contact Mr. Galea? Well, this is how it worked out, Your Honor. This was a business venture that was set up by the plaintiff's team. This is not just Mr. Galea trying to look for a policy and trying to look for a loan. Mr. Galea had Mr. Mbembo, his CPA, which he pleads as Mbembo is his agent in the operative second amended complaint. He also has the insurance agent, Mr. Castro, and he has two lawyers on his team. So what happened here is that Hammett, one of the lawyers, contacted Burgess, Burgess put together the papers, and he emails the documents to Castro's associate, I think it's Mr. Gutierrez, and to the lawyer, Mr. Hammett. And somehow those papers get to Mr. Mbembo, and Mr. Mbembo reads through them, sees, wow, there's a personal guarantee here. There's a document that says personal guarantee. There's a document right on the front, guarantor, Charles Galea, nobody else, Charles Galea. And then you look at the second paragraph, it's abundantly clear from the document that it is a personal guarantee. My understanding of the negligence claim is that it at least attempts to accept all of that and say, but he never should have been put in the position of having, it was negligence to set him up with a loan, with a personal guarantee for one year when there was no way or no plan for having him able to pay the premium for the second year because the net result is that he was going to owe the $1.7 million, which we know he didn't have, or at least he says he didn't. So in other words, I understand the negligence claim to be taking off in a different direction. It would be helpful if you talk about that. In other words, I understand the negligence claim to not be quarreling about the reliance, but instead to be saying that Burgess had a professional responsibility somehow to Galea, because he knew that was the ultimate person who was going to pay the loan, to not set up this loan in a way that it was certain that Galea was going to be out $1.7 million. I think, Your Honor, our argument to that would be that even the plaintiffs admit in their second amended complaint that Burgess was the lender's agent. Burgess was not Galea's agent. And he was very clear about that, which is why I asked the question. Then he comes up with his third-party negligence issue, and I guess that's what we need to talk about. I'm not sure that there's a whole lot of evidence in the record showing that there was any representation made by Burgess as to the period of the loan. Well, not a whole lot, but there is some, enough to get by summary judgment, so let's assume that. As to the question of whether he represented to somebody, although not to Galea, that there was a no-recourse loan. He represented that he thought he could get a no-recourse loan. He wound up getting a recourse loan. It was obvious to everyone it was a recourse loan, and that's where we're at. In terms of the negligence claim as to the timing of everything, I'm not so sure that our guy, that's his responsibility. I'm not so sure that anybody said to him, said, hey, Stephen Burgess. You may not be sure, but this was summary judgment, so the question is why doesn't he get to go to trial on it? I'm sorry? I said you may not be sure, but this was summary judgment, so why doesn't he get to go to trial on it? But I don't think that was argued in any of the oppositions. I don't think it was argued in the plaintiff's briefs. I may be wrong about that. Counsel, it's kind of an obvious question, though. If he couldn't afford the first year's premium and he was at an advanced age, then it seems to me the only way he's not going to be left holding the bag is if he died in the first year. Otherwise, when the second premium comes due, if he can't pay it, and there's no reason to think he could, then the policy was going to lapse just as it did, right? That's Judge Berzon's question. Wasn't there somebody along the line, and I think your client did collect a half-a-million-dollar commission. Did he not have some obligation to say, well, you requested a non-recourse loan. That's not what this is. It's a recourse loan. And does this instrument make any sense for you? Your position is he has no obligation to say anything about that. Is that right? Well, I think the record shows that this deal was put together so that the life insurance could be bought. Then the loan would be obtained, so there's two parts to the deal. The insurance would be sold on the secondary market, and that money would be used to pay off the loan, and then everybody would profit. But it appears, I mean, I guess the allegation is, and there is some support for this in the expert's declaration, that it couldn't be sold until at least two years, which makes sense. I mean, why would anybody buy this? I mean, I gather the two years seems to be about two things. One is the non-contestability part, and the other is I gather this policy was building up value, meaning that it could be cashed in even if he didn't die. Was that the idea? I believe so, Your Honor. I don't, to be honest, I don't know. And that after two years, it might have enough value to be. But in any event, the contention, as I understand it, is that they at least had to have funding for the second year, and they didn't, and that Burgess made no provision for that. Burgess made no provision for that. So that's the point that the plaintiff is raising, if not before, he's raising it today. And is your view that there was no, his argument earlier, just a few minutes ago, was that there was no, I guess you're saying that Burgess had no obligation to say does this overall, I don't want to use the word scheme because I don't mean any negative connotation by that, but does this picture make any sense for you? You couldn't afford the first year premium, right? If he doesn't die in the first year, another premium is going to come due because there's at least an expert report in the record that suggests that he wasn't going to be able to sell this on the secondary market. So it does seem to be a case of cards that really couldn't work for him very well. So is there a question of fact there? Why isn't there a question of fact that that was negligent to not say, hey, this isn't going to work for you? I don't believe that there's a question of fact, Your Honor, because our client's role was really in procurement of the loan. The deal to buy the insurance and to set up the whole big picture deal, that was not, he was not part of that. He was contacted after the insurance was already bought and paid for by Mr. Hammett, the plaintiff's attorney, to try and set up some sort of financing. So even though his position is, I think we're saying the same thing, and we certainly understand the facts the same way, even though he understood that the original request was non-recourse and he thought he could get non-recourse and he made that representation that as long as he was clear that it wasn't, that he satisfied his obligation. He satisfied his obligation by providing the documents that were abundantly clear that it was a recourse loan, not only to the plaintiff, but to the plaintiff's lawyer, to the plaintiff's insurance agent. There's evidence in the record that the plaintiff's lawyer, I can't remember whether it was Wagner or Hammett, told Mr. Mbimbo, hey, this deal looks good, just make sure that there's no personal guarantee. Because if there's a personal guarantee, it's a recourse loan. And maybe that's what set off the bells in Mr. Mbimbo's head to say, gee, this doesn't look right. And then, but for whatever reason, they went forward. And they knowingly went forward despite everything that, despite all of the documentation that they received. Do you happen to know whether the inquiry to Burgess or through whomever it was, whether it was Castro or Hammett, I guess it was Hammett, was for a loan for a year, just one year? I don't know that off the top of my head, Your Honor, I don't. Unless there are any further questions? Thank you. Thank you. Thank you, Your Honor. Do you know the answer to that question? It was not just for one year, it was just for premium financing of the transaction. It was not that specific. It was for what, I'm sorry? Just premium financing to. But it was specifically a request for a loan of $1.7 million? No, because the inquiry was the premium financed the whole thing. And then when it came back, it said, well, we've got you $1.7 million, which will pay the first year. That's what I understand the fact is. So, again, Burgess should have, you know, being the expert in this area, should have, as our expert said, should have had in place financing to take it beyond the first year because, as the court has noted, it wouldn't do my client any good unless he died in that first year. But why is Burgess in a position to know, nobody's in a position to know whether he was going to die that year, but why is Burgess in a position to know that it wasn't going to be ultimately possible for him to sell it on the secondary market? It wasn't Burgess to know that it wasn't possible? Right. Well, he's holding himself out to be an expert in this area, and he's a licensed insurance agent himself. But the ultimate problem is that what obligation does he owe to Galea to be sure that Galea is going to be able to fund the second year? Well, he owed an obligation to inform him to tell him, I can't get any financing beyond the first year. Galea would have probably backed out of the deal, I'm sure. But he knew he wasn't getting any financing beyond the first year. What's that? He certainly knew that he wasn't getting financing beyond the first year. Well, sure, he only got one year. Well, he did do that. He came back and he says, I have financing for one year. So what was the next problem? Burgess, he obtained a one-year loan, and he never contacted the client. He didn't do anything. But it wasn't his client. That's the problem. It doesn't matter if he's knowing that the Biaconga and Lucas v. Hamm line of cases say that a professional has a duty even if it's a non-client. Well, what kind of professional is he exactly? I mean, he's an intermediary to get loans. Well, holding himself out on his website. I mean, he's not a lawyer. He's not an accountant. He's not an auditor. I mean, he's not an actuary. I mean, he's a salesman. Well, but his website touts himself as this big specialist in this premium financing of large life insurance policies. It touts it. In fact, the fact that it touts that he can get on his website no personal recourse, that would seem to suggest that it was reasonable for Galey to rely on that. I just want to cover a few points, Your Honor. Well, Your Honor, time is almost up here, so make it quick. Very quickly. The negligence claim, of course, I think the Court knows this. Reliance is not an element of the claim. Our expert says that Berges had a duty to contact Galey and say, I cannot get you non-recourse financing. The only thing available is recourse financing. If he'd done that, the whole transaction would have gone away. He wouldn't have gotten this big commission. And I think counsel, opposing counsel said that, mentioned Mr. Attorney Wagner. He was the attorney who came in for Galey after the first year that was involved in trying to refinance the whole thing, and it was never successful. But he was not there at the front end. I just want to clarify that point. Mr. Galey didn't actually have an attorney at the front end representing him. Hammett was the attorney brought in by Castro to try to get the financing. So, again, my final comment is I don't see how Berges can just insulate himself, collect this large commission, has no duties. What about the fact that he'd already bought the policy before they even went to Berges? Well, that's a good question, Your Honor. I know it's a good question. What happened was Mr. Galey had put down a first quarter premium or something, like $400,000, some deposit. But he could get that back within a period of 30 or 60 days and cancel the whole thing. But then they ended up getting the financing, and he got that money back. So he could have withdrawn from the whole thing and gotten that initial deposit back. He was never going to be able to finance $25 million in live insurance out of his pocket. Again, the declaration of our expert goes into detail about how, based on his income, there's no way he could afford this policy. Those are the facts. Okay. Thank you. Thank you, counsel. We appreciate your arguments this morning. Thank you. Our next case for argument is Kim v. Peerless Insurance Company.
judges: Paez, Berzon, Christen